HAMBROSE LEASING 1984-5 LIMITED PARTNERSHIP, BARRY M. GOLDWATER, JR., TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HAMBROSE LEASING 1984-2 LIMITED PARTNERSHIP, BARRY M. GOLDWATER, JR., TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17736-88, 17742-88.    Filed September 1, 1992.

*Elliot Silverman* and *Jeffrey A. Schantz,* for petitioner.
*Elizabeth P. Flores,* for respondent.

OPINION

TANNENWALD, *Judge:* By notices of final partnership administrative adjustment (FPAA), respondent disallowed certain deductions claimed by Hambrose Leasing 1984-5 Limited Partnership and Hambrose Leasing 1984-2 Limited Partnership[1] for depreciation, guaranteed payments, office expenses, and interest expenses for the partnerships' 1984 taxable year.

Respondent has conceded all of the issues raised in the FPAA's but by amendment to answers has raised the issue of the applicability of the at-risk provisions of section 465(b)(4).[2] That issue presents jurisdictional as well as substantive issues.

These consolidated cases were submitted fully stipulated pursuant to Rule 122(a). The stipulations of facts, together with the accompanying exhibits, are incorporated by reference.

Petitioner in each case is the tax matters partner (TMP) of Hambrose Leasing 1984-5 and Hambrose Leasing 1984-2 Limited Partnerships (hereinafter referred to as the 1984-5 and 1984-2 partnerships, respectively), both TEFRA partnerships pursuant to sections 6221 through 6233. His address was 950 Third Avenue, New York, N.Y., at the time the peti-

---

[1] Unless otherwise indicated, the Hambrose Leasing 1984-5 and Hambrose Leasing 1984-2 Limited Partnerships shall collectively be referred to as "the partnerships".

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

tions herein were filed. In 1984, each partnership purchased "initial equipment" and "additional equipment". Such purchases were the last in a series of acquisitions of such equipment by prior purchasers. We set forth below only such facts of such prior purchases and those of the partnerships necessary to an understanding and resolution of the jurisdictional issue on the basis of which we dispose of these cases.

*Hambrose Leasing 1984-5 Initial Equipment Purchase*

The 1984-5 partnership purchased certain IBM computer equipment, referred to as the "initial equipment", for use in its equipment leasing business.

The initial equipment was originally purchased by CIS Leasing Corp. (CIS). Financing for the CIS purchase was provided by Lincoln Lease/Way, Inc. (Lincoln). A nonrecourse note in the amount of $589,791.26 was executed by CIS and payable to Lincoln. CIS entered into user leases with Fluor Corp. (Fluor) for the initial equipment.

The initial equipment was later purchased by Charterhouse Leasing Associates Limited Partnership (Charterhouse) from CIS for $419,132 and was part of a larger purchase of several pieces of IBM equipment (the aggregate equipment). The aggregate equipment was leased to Fluor. Charterhouse paid $971,053.00 for the aggregate equipment as follows: (a) Cash of $101,961.00; (b) an assumption of CIS's original loan in the amount of $638,276.76; and (c) the execution of a residual note in the amount of $230,815.24. The amounts payable as a result of the assumption of CIS's original loan and the residual note were nonrecourse obligations of Charterhouse.

On or about March 19, 1984, Hambrose Reserve Ltd., a Delaware corporation (Hambrose Reserve), purchased the initial equipment from Charterhouse for $419,131, subject to the liens of the original third-party lender and the user lease. The purchase price was payable as follows: (a) $47,000 in cash on May 8, 1984; and (b) $372,132 by an installment note. The note is unsecured and is payable in 85 consecutive monthly installments of $6,287.99 with the first payment due on April 1, 1984.

Section 5.3 of the installment promissory note provided as follows:

5.3 *No Set-Off, Counterclaim, Etc.* The Payor's obligation under the Installment Note shall be absolute and unconditional under all circumstances. Payor hereby waives any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which the Payor may have against the Payee or anyone else for any reason whatsoever, including, without limitation * * *

The note also provided, in section 4.1, as follows:

4.1 *Deferral.* In the event the Lease is terminated prior to the expiration of the Lease Term (as defined therein) for any reason whatsoever, Payor shall have the right to defer payment of principal and interest as the same becomes due hereunder if and to the extent any amount of principal and interest or other sum becoming due to Payor under an installment promissory note - security agreement of even date issued by Transportation Leasing-4 Limited Partnership[3] ("Owner") to Payor is not received by Payor as the same becomes due (the "Past Due Sum").

Concurrently with Hambrose Reserve's purchase of the initial equipment from Charterhouse, Charterhouse leased back the initial equipment from Hambrose Reserve pursuant to a wrap lease (initial equipment wrap lease). The terms of the initial equipment wrap lease provide for fixed rent payments of $6,287.99 per month for 85 consecutive monthly amounts commencing April 1, 1984.

M&J Holding Corp., a Delaware corporation, was the sole stockholder of Hambrose Reserve and is the general partner of Charterhouse.

On March 19, 1984, the 1984-5 partnership purchased the initial equipment from Hambrose Reserve for $419,132 subject to all liens of the third-party lender and Hambrose Reserve, and subject to the user lease and the initial equipment wrap lease.

The 1984-5 partnership paid for the initial equipment as follows: (a) $49,000 cash, by payment of $1,000 on May 8, 1984, and payment of $48,000 on December 31, 1984; and (b) $370,132 by an installment note, secured by the initial equipment. The note was payable in 85 consecutive installments of $6,287.99 commencing on April 1, 1984, and was secured by a lien and security interest in and to the initial equipment. As to the 1984-5 partnership, all obligations created under the note were nonrecourse.

---

[3] Transportation Leasing-4 Limited Partnership was the original name for Hambrose Leasing 1984-5 Limited Partnership.

Hambrose Reserve assigned the initial equipment wrap lease to the 1984-5 partnership.

*Hambrose Leasing 1984-5 Additional Equipment Purchase*

The 1984-5 partnership purchased other IBM equipment described as the "additional equipment". The additional equipment was initially purchased by Comdisco, Inc. (Comdisco), and leased to different end users. The purchase was financed by various third-party lenders. Comdisco's obligations to the third-party lenders were nonrecourse.

The additional equipment was subsequently acquired from Comdisco by Charterhouse in seven separate purchase transactions, one each for the additional equipment under each user lease. The purchase price for the additional equipment was $14,993,873.00, which was paid as follows: (a) $1,623,339.11 in cash; (b) installment notes of $6,037,641.00; (c) residual notes of $82,935.00; and (d) an assumption of $7,249,957.89 of the notes executed by the original purchasers of the additional equipment.

Charterhouse's obligation to pay installments due under the installment notes was contingent on its receipt of lease payments due under the equipment leases. Charterhouse's assumption of the notes executed by Comdisco was a nonrecourse obligation. Each residual note was due on June 30, 1991, with interest at 15 percent per annum and was prepayable out of 67 percent of the Charterhouse share of re-lease rentals payable to Charterhouse under a remarketing agreement with the original purchaser.

Hambrose Reserve purchased the additional equipment from Charterhouse for $14,421,478, subject to all other liens and leases including the liens of the original third-party lenders, Comdisco, and user leases. The purchase price was payable as follows: (a) $1,700,00 in cash; and (b) an installment note of $12,721,478 payable in nine installments. The installments were payable beginning in 1984 with the last one due in 1994.

With respect to Hambrose Reserve's obligation under the note, section 5.3 provided as follows:

5.3 *No Set-Off, Counterclaim, Etc.* The Payor's obligation under the installment note shall be absolute and unconditional under all circumstances. Payor hereby waives any right of set-off under state or federal

law, counterclaim, recoupment, defense or other right which the Payor may have against the Payee or anyone else for any reason whatsoever, * * *

The note further provided in section 4 that:

4.1 *Deferral.* In the event the Lease is terminated prior to the expiration of the Lease Term for any reason whatsoever, Payor shall have the right to defer payment of principal and interest as the same becomes due hereunder if and to the extent any amount of principal and interest or other sum becoming due to Payor under an installment promissory note * * * issued by Hambrose Leasing 1984-5 Limited Partnership ("Owner") to Payor is not received by Payor as the same becomes due (the "Past Due Sum"). * * *

Concurrently with the purchase of the additional equipment by Hambrose Reserve from Charterhouse, Charterhouse leased back the additional equipment from Hambrose Reserve pursuant to a wrap lease (the additional equipment wrap lease). Payments due under the wrap lease from Charterhouse to Hambrose Reserve were equal in amount to the installments due Charterhouse under the installment note executed by Hambrose Reserve.

The 1984-5 partnership purchased the additional equipment from Hambrose reserve for $14,421,478 subject to all other liens and leases including those of the other original third-party lender, the original purchasers, and Hambrose Reserve. The purchase price was paid as follows: (a) $1,442,148 in cash; and (b) an installment note of $12,979,330 secured by the additional equipment. The installment note was nonrecourse as to the partnership.

The general partner of the partnership was personally liable for $36,000 of the $12,979,330 note, and each limited partner assumed his pro rata share of the $12,979,330 note in an amount equal to $92,363 per limited partnership unit.

The additional equipment wrap lease was assigned to the partnership pursuant to the partnership's purchase of the additional equipment.

Payments due under the wrap lease from Charterhouse to the partnership were essentially equivalent in amount to the installments due Hambrose Reserve under the installment note executed by the partnership. The installments were payable beginning in 1984 with the last one falling due in 1992.

*Hambrose Leasing 1984-2 Purchase of Initial and Additional Equipment*

In a sequence of transactions, financing arrangements, and user leases, which, except for amounts, substantially mirrored those leading to the 1984-5 partnership's purchase of the initial equipment and the additional equipment, the 1984-2 partnership became the purchaser of certain IBM computer equipment (the initial equipment and the additional equipment) and was assigned wrap leases with respect to such equipment.

With respect to the purchase of the additional equipment, the 1984-2 partnership executed a note payable to Hambrose Reserve in the amount of $9,740,596. The general partner was personally liable for $27,511 of the note, and each limited partner personally assumed a pro rata share of the note in an amount equal to $90,303 per limited partnership unit.

The partnerships timely filed U.S. Partnership Returns of Income (Forms 1065) for the taxable year 1984. The partnerships, on their 1984 Federal information returns, claimed the following deductions:

|  | *1984-5 Partnership* | *1984-2 Partnership* |
|---|---|---|
| Depreciation | $1,855,077 | $1,431,518 |
| Guaranteed payment | 36,000 | 27,511 |
| Office expense | 75 | 861 |
| Interest expense | 548,733 | 824,391 |

On April 14, 1988, respondent timely sent FPAA's to the TMP of the partnerships disallowing all of the deductions claimed on the Forms 1065. Having conceded all issues originally raised in the FPAA's, see *supra* p. 299, by amendment to answers, respondent contends that an arrangement was created through the nonrecourse nature of the underlying purchase notes and the offsetting of rental and debt payments which protected the partnerships against loss on the notes issued to Hambrose Reserve, and that the resolution of this issue is properly before us in this proceeding. Respondent further contends that the partners were protected against loss for their pro rata share of the partnerships' liabilities and that the determination of the partners' at-risk amounts involves a partnership item and is therefore an issue in this proceeding.

Petitioner counters that section 465 has no application to partnerships and that the determination of a partner's amount at risk does not involve a partnership item subject to resolution in an FPAA proceeding. Petitioner further contends that there was no stop loss arrangement within the meaning of section 465(b)(4) which would render the partners not at risk for their assumed portion of the partnerships' debt.

Initially, we note that there is considerable confusion as to whether the issue involves the obligations of the partnership or the obligations of the individual partners or both. The stipulation of the parties states:

8. The sole issues in dispute in this case are whether the Partnership was protected against loss within the meaning of section 465(b)(4), and if so, whether this issue is a "partnership item" which was properly raised at the partnership level pursuant to sections 6221 through 6233.

However, the arguments of the parties on brief are not so confined.

As we see it, the substantive issue involved herein turns upon whether the individual partners were at risk within the meaning of section 465. In this context, we must first decide the extent to which that issue involves a "partnership item" and is therefore a question which can be determined in a partnership level proceeding pursuant to sections 6221 through 6233.[4] In the final analysis, our disposition of this issue depends upon the import of our opinion in *Roberts v. Commissioner,* 94 T.C. 853 (1990).

In *Roberts,* we concluded that the determination of the amount at risk in respect of a partner was not a "partnership item" but an "affected item"[5] where resolution of the at-risk issue involved an analysis of third-party side agreements which respondent claimed protected the partners against loss on their assumption of certain partnership liabilities. We therefore held that the at-risk issue was not an issue which should have first been resolved in a partnership level

---

[4] Sec. 6226(f), which establishes our authority to review final partnership administrative adjustments, provides:

SEC. 6226(f). SCOPE OF JUDICIAL REVIEW.—A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates and the proper allocation of such items among the partners.

[5] An "affected item" is any item to the extent such item is affected by a "partnership item". Sec. 6231(a)(5).

proceeding in respect of an FPAA but was properly raised at the individual partner level. The basic thrust of respondent's position is that the rationale of *Roberts* does not apply where the at-risk issue relates only to the effect of netting provisions in the agreements of the partnership. For the reasons hereinafter set forth, we disagree.

In partnership proceedings, only "partnership items" may be considered. *Affiliated Equipment Leasing II v. Commissioner,* 97 T.C. 575, 576 (1991); *885 Investment Co. v. Commissioner,* 95 T.C. 156, 163 (1990). Section 6231(a)(3) defines a partnership item as follows:

> (3) PARTNERSHIP ITEM.—The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

It is important to note that only items which are "*'required to be taken into account for the partnership's taxable year'*" constitute partnership items. *Dial USA, Inc. v. Commissioner,* 95 T.C. 1, 3 (1990) (emphasis added); *Roberts v. Commissioner, supra* at 862; see also sec. 301.6231(a)(3)-1a(a), Proced. & Admin. Regs.

Section 465 limits the deductibility of losses from certain activities, including leasing of section 1245 property,[6] to the amount a taxpayer is considered at risk at the close of the taxable year. A taxpayer generally is considered to be at risk with respect to amounts borrowed to the extent that the taxpayer is personally liable for the repayment of such amounts. Sec. 465(b)(2)(A). A taxpayer is not at risk, however, "with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements". Sec. 465(b)(4).

It is against the foregoing background that we deal with the arguments of the parties which are directed to the application of the provisions of section 6231 and the following provisions of the regulations thereunder, section 301.6231(a)(3)-1, Proced. & Admin. Regs.:

---

[6] The equipment purchased by the partnerships and leased to third parties is sec. 1245 property. See sec. 1245(a)(3).

(a) IN GENERAL. For purposes of subtitle F of the Internal Revenue Code of 1954, the following items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items:

(1) The partnership aggregate and each partner's share of each of the following:

\* \* \* \* \* \* \*

(v) Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year); and

\* \* \* \* \* \* \*

(vi) Other amounts determinable at the partnership level with respect to partnership assets, investments, transactions and operations necessary to enable the partnership or the partners to determine—

\* \* \* \* \* \* \*

(C) Amounts at risk in any activity to which section 465 applies;

\* \* \* \* \* \* \*

(4) Items relating to the following transactions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for purposes of furnishing information to a partner:

(i) Contributions to the partnership;

(ii) Distributions from the partnership; and

(iii) Transactions to which section 707(a) applies (including the application of section 707(b)).

Focusing on these regulations and the fact that only partnership liabilities are involved herein,[7] respondent contends that the determinations establishing whether individual partners are at risk under section 465(b)(4) are partnership items, and that we therefore have jurisdiction to make such determinations. To the contrary, petitioner asserts that the at-risk issue involves items that are, at best, affected items, not partnership items, and that if the regulations are construed to make those items eligible for determination in a

---

[7] Petitioners have not contended that the at-risk issue in this case involves liabilities of the partners to third parties, the situation in *Roberts v. Commissioner,* 94 T.C. 853 (1990).

partnership level proceeding, they contradict the plain definitional language of the statute and are invalid.

1. *Section 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.*

This section provides that partnership liabilities, including determinations with respect to their amount and whether they are recourse or nonrecourse, are more appropriately determined at the partnership level and are partnership items, to the extent they are required to be taken into account for the taxable year of the partnership. Thus, the question is whether partnership liabilities are required to be taken into account for the taxable year of the partnership. See *Dial USA, Inc. v. Commissioner, supra* at 3.

In our view, partnership liabilities should be determined and taken into account at the partnership level whenever such determination produces a uniform effect on the partners. For example, such determinations should occur where the issue involves: (1) Whether a partnership's transactions have economic substance and are engaged in for profit; i.e., whether the transactions will be respected for Federal income tax purposes; (2) the bases of partnership assets for depreciation, the investment tax credit, the energy credit, et cetera; and (3) amounts to be reported on the Schedule K-1, Form 1065, Partner's Share of Income, Credits, Deductions, Etc.,[8] and the Partnership Return of Income, Form 1065. Resolution of such issues is not affected by the circumstances of the individual partners. Accordingly, these issues are properly considered "partnership items" to be dealt with in a partnership level proceeding.

The difficulty, in the instant case, is that none of such issues are disputed herein. Thus, as previously noted, *supra* p. 299, respondent has conceded that the leasing transactions of the partnerships had economic substance and were engaged in for profit. The partnership notes are, by their very terms, nonrecourse, and petitioners do not contend otherwise. Finally, the parties are in agreement as to the amounts of the liabilities created by the notes.

Thus, there are no issues left which fall within the type of liabilities covered by the regulation. The only issue remain-

---

[8] Line B of the Schedule K-1 reports a partner's share of partnership liabilities and characterizes such liabilities as "nonrecourse", "qualified nonrecourse financing", or "other".

ing is whether the assumption of the liabilities of the partnerships by the individual partners put those partners at risk or whether they were protected against loss within the meaning of section 465(b)(4). But that issue relates to the status of the partners and not the status of the partnership. Under these circumstances, the at-risk issue is clearly not a "partnership item" but an "affected item" to be dealt with in a partner level proceeding. *Roberts v. Commissioner,* 94 T.C. 853 (1990). The fact that relationships between the partnership and third parties may have to be taken into account in that proceeding in order to determine the tax consequences attaching to such an item does not require a different conclusion. See *Roberts v. Commissioner,* 94 T.C. at 862; cf. *Thornock v. Commissioner,* 94 T.C. 439, 452 (1990).

*2. Section 301.6231(a)(3)-1(a)(1)(vi)(C), Proced. & Admin. Regs.*

This section provides that amounts (other than those subject to section 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.) determinable at the partnership level with respect to partnership assets, investments, transactions, and operations which enable the partners to determine amounts at risk in an activity are partnership items. Subdivision (C) specifically identifies "Amounts at risk * * * to which section 465 applies". For instance, a determination of amounts borrowed by the partnership for use in section 465 activities and the recourse or nonrecourse character of its liability would assist the partners in determining their amount at risk for the taxable year. Matters that would appear to be appropriate for determination in a partnership level proceeding, under this provision of the regulations, include the following:

(1) Amounts invested by the partnership in activities subject to the at-risk rules;

(2) losses incurred by the partnership in activities subject to the at-risk rules; and

(3) partners' shares of losses incurred in activities subject to the at-risk rules.

In our opinion, section 6231 and the foregoing regulations do no more than give us jurisdiction to make the foregoing determinations in a partnership level proceeding and do not extend our jurisdiction to determine, in a partnership level

proceeding, whether and to what extent the partners are at risk within the limitations of section 465. Cf. *Roberts v. Commissioner, supra.*[9] We reach this conclusion for the following reasons.

First, the at-risk rules of section 465 apply to limit the deductibility of losses only by individuals and certain C corporations. See sec. 465(a)(1); *Roberts v. Commissioner, supra* at 861 n.5. Except to the extent that partnership level determinations may influence the ultimate application of that section, it has no impact on partnerships, which are essentially only conduits for reporting information and incur no tax liability. It is only after the losses, deductions, and credits of a partnership have flowed through to individual partners that the at-risk status of the partners can be determined. Moreover, the amount of those losses, deductions, and credits is not affected by the partners' at-risk status. Cf. *Roberts v. Commissioner, supra* at 861. In this context, we think it significant that the reference in subdivision (C) is to "*Amounts* at risk" (emphasis added) and not to section 465 generally. In short, the application of section 465 is not a determination "required to be taken into account for the partnership's taxable year". Sec. 6231(a)(3). Rather, it is a determination that individuals and certain C corporations must make.

Second, the critical inquiry in determining the extent to which the partners are at risk under section 465 is who bears the ultimate financial responsibility to satisfy the obligation. See *Krause v. Commissioner,* 92 T.C. 1003, 1017 (1989). The answer to that question often turns on the circumstances and arrangements unique to each individual partner, information that is not always available at the partnership level. Cf. *Roberts v. Commissioner, supra.* In this connection, we note that although such arrangements do not appear to be involved herein, see *supra* p. 307, the actual existence of such arrangements is not required. Rather, it is the potential that the section 465 issue may depend upon such arrangements that counts. See *Dial USA, Inc. v. Commissioner,* 95 T.C. at 6.

---

[9] Cf. *Sealy Power, Ltd. v. Commissioner,* T.C. Memo. 1992-168; *Gemini Twin Fund III v. Commissioner,* T.C. Memo. 1991-315.

Under the foregoing circumstances, we interpret the reference to section 465 in subdivision (C) of the regulations to be confined to issues relating only to the nature and extent of the partnership liabilities, i.e., recourse or nonrecourse, and the amounts thereof.

*3. Section 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs.*

This section includes, as partnership items, any items relating to contributions to the partnership, distributions from the partnership, and transactions between the partnership and a partner not acting in his capacity as a partner, to the extent that a determination of the item can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for furnishing information to a partner. See sec. 301.6231(a)(3)-1(c)(1), Proced. & Admin. Regs., for illustrations of these items.

While, at first blush, this regulation may seem broad enough to permit virtually any determination of an item in a partnership level proceeding so long as it is related, even remotely, to the partnership, an item is not a partnership item under this subparagraph unless required to be taken into account for the taxable year of the partnership. Sec. 6231(a)(3); sec. 301.6231(a)(3)-1(a), Proced. & Admin. Regs.

As previously stated, see *supra* pp. 309-310, whether the partners are at risk for partnership liabilities has no effect on the partnership, its books and records, or any other aspect of the partnership. Moreover, amounts at risk cannot be conclusively determined, see *supra* p. 310, without the benefit of "additional information" which often is not available at the partnership level. Sec. 301.6231(a)(3)-1(c)(2), Proced. & Admin. Regs. Thus, section 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs., does not support respondent's assertion that the determination of individual partners' amounts at risk is a partnership item.

Respondent alternatively argues that even if we are without jurisdiction to determine whether the partners are protected against loss, we have jurisdiction over the partnership item components which affect that determination at the partner level, namely, the recourse or nonrecourse nature of the

partnerships' notes assumed by the partners. We agree. But the fact of the matter is that the partnership notes are clearly nonrecourse and petitioners do not contend otherwise, see *supra* p. 308, so that no further consideration of that issue is necessary.

We conclude, based on the circumstances of this case, that the determination of amounts at risk with respect to partnership liabilities personally assumed by individual partners is not a partnership item, but is an affected item, which can be dealt with only in a proceeding involving the partners and not in this partnership level proceeding. Sec. 6226(f); *N.C.F. Energy Partners v. Commissioner,* 89 T.C. 741, 743 (1987). We base this conclusion on the definition of "partnership item" in section 6231 ("required to be taken into account for the partnership's taxable year"), our interpretation of the pertinent regulations, in light of the statute (an approach which makes it unnecessary for us to rule on petitioners' contention that the regulations are invalid), and the application of the statute and regulations in the decided cases. In short, the application of section 465 as such is not an issue appropriate for a determination in a partnership level proceeding. See *Dial USA, Inc. v. Commissioner,* 95 T.C. at 5 n.5.[10]

The issue of whether the partners are at risk under section 465 can be raised by respondent through the issuance of notices of deficiency to the partners at the conclusion of this proceeding. See, e.g., *Roberts v. Commissioner,* 94 T.C. at 859; *N.C.F. Energy Partners v. Commissioner, supra* at 745; *Maxwell v. Commissioner,* 87 T.C. 783, 792 (1986). The nonrecourse character of the partnership notes and the issues of the economic substance and profit motive in respect of the partnership transactions will be binding on the partners in any litigation that may ensue. See *N.C.F. Energy Partners v. Commissioner, supra* at 746-747. We are not unaware of the fact that our conclusion herein may result in a multiplicity of proceedings rather than a unified proceeding at the partnership level which was a legislative objective in enacting the partnership audit and litigation procedures (sections 6221-6233). But our conclusion is consistent with the legislative pattern which recognizes the separateness of part-

---

[10] See also *Sealy Power, Ltd. v. Commissioner,* T.C. Memo. 1992-168.

nership items, nonpartnership items, and affected items and consequently erects a structure which made jurisdictional division inevitable. See *N.C.F. Energy Partners v. Commissioner,* supra at 747.

> *Appropriate orders and decisions will be entered.*